**Marion R. FROST and Robert G. Frost, Plaintiffs,**

v.

**MAYO CLINIC, Mayo Foundation, and Dr. George S. Baker, Defendants.**

**No. 1-66-Civ-4.**

United States District Court
D. Minnesota,
Third Division.

Oct. 8, 1969.

Thomas F. Burns, St. Paul, Minn., for plaintiffs.

Henry Halladay, Minneapolis, Minn., for defendants.

### MEMORANDUM AND ORDER

DEVITT, Chief Judge.

In this medical malpractice case against the Mayo Clinic[1] brought by a former patient and her husband, the jury returned a plaintiffs' verdict for $50,000. Defendants move for Judgment N.O.V. or a new trial.

Plaintiff Marion R. Frost, a 46-year-old housewife from Elgin, Illinois, was bothered with low back problems for about ten years prior to August 6, 1962. She sought medical help at the Mayo Clinic at Rochester, Minnesota. The Clinic doctors diagnosed her case as one of a protruded intervertebral disc. Dr. George S. Baker, a Clinic neurosurgeon, performed surgery on August 16, 1962 and removed the disc. No complaint is made as to the performance of this operation.

Dr. Baker performed a second operation in the same surgical site two days later, at 10:15 a. m. on August 18, 1962 in response to the complaints of the patient and a showing of neurological deficits following the first operation. In the second operation the neurosurgeon was looking for a possible blood clot or hematoma. He did not find such. He did find some swelling of oxycel, which had been used as a coagulant at the time of the first surgery. He also found swelling of the cauda equina. He performed a decompression.

The patient did not experience a normal recovery. She is permanently partially paralyzed. She wears leg braces and suffers marked physical disabilities.

---

1. Additional defendants are the Mayo Foundation, a non-profit corporation which owns all properties used by the Mayo Clinic, and in return for their use, receives as rent all income of the Clinic after expenses, and Dr. George S. Baker, Mayo Clinic Neurosurgeon. The action against St. Mary's Hospital, Rochester, and several nurses was dismissed before trial.

The issue at trial was as to the claimed negligence of the defendants in not determining the need for, and more promptly performing, the second surgical procedure and as to the causation between such claimed negligence and Mrs. Frost's subsequent physical disability.

The trial extended over 31 days. Forty-two witnesses testified, many of them medical doctors, nurses and nurses' aides. The plaintiffs sought to show that starting almost immediately after the first operation on August 16, the patient experienced inordinate pain and complained of such repeatedly; had marked neurological deficits such as numbness of the legs and inability to wiggle her toes and other signs of paralysis; and that the defendants were negligent in not more quickly intervening with a second surgical procedure to alleviate the pain and to stop the ascending paralysis; and that their failure to do so promptly was the cause of the permanent paralysis. Three medical doctors testified as experts in support of plaintiffs' theory of the case.

The defendants sought to show that some pain is common to all post-surgical patients; that some neurological deficits were normally to be expected for a time following a laminectomy; that the hospital records did not support many of Mrs. Frost's claims of complaint to the nurses and doctors; that it was risky and medically unwise to re-operate too soon after the first operation and until the medical facts would support such a judgment; and that the medical facts did not indicate the need for a second operation until August 18th. The defendants also sought to show that defendants' negligence, even if proved, was not a direct cause of Mrs. Frost's paralytic condition. Two medical experts, one a neurosurgeon, the other an orthopedic surgeon, together with several other doctors, some associated presently or in the past with the Mayo Clinic, testified in support of the defendants' theory of the defense.

The case was submitted on the issues of negligence and proximate cause and the jury returned a plaintiffs' verdict for $50,000.00.

Defendants' motion for Judgment N.O.V. is based on the ground that there was no competent evidence that defendants breached any applicable standard of care or that if they did, the conditions complained of were a direct result; and the motion for a new trial is based on the claimed incompetency of plaintiffs' medical witnesses and the impropriety of receiving their opinions in evidence.

The arguments in support of, and in opposition to, the motions are intertwined in the respective briefs of the parties and conveniently may be considered together.

The burden of defendants' argument is that the plaintiffs did not present competent expert medical testimony to support the claimed departure by the defendants from the recognized standard of medical care owed to Mrs. Frost.[2]

Plaintiffs presented three medical experts, each a medical doctor. None of them was a specialist in neurosurgery. One received his medical degree and training in England, another at the University of Arkansas, and the third at the University of Illinois. All are licensed practitioners. One of them, Dr. Harold S. Wandling of Los Angeles, California, is a specialist in general surgery. He had three years of post graduate training in surgery. He had assisted neurosurgeons and orthopedic

2. Without objection, the Court instructed the jury as to this standard of care as follows:

In performing professional services for a patient, a doctor must use that degree of skill and learning which is normally possessed and used by doctors in good standing in a similar practice in similar communities and under similar circumstances, and in the application of that skill and learning, he must use reasonable care. The failure to comply with this standard is a form of negligence which in common parlance is called medical malpractice.

surgeons in disc operations. He is a Diplomate of the American Board of Surgery and is a member of other professional organizations. He was an impressive witness for the plaintiffs.

The defendants' experts were also all medical doctors and well qualified by education, training and experience. One of them, Dr. Lyle A. French, is professor and Chairman of the Neurosurgery Department at the University of Minnesota. He has performed some 200 disc operations. Another of them, Dr. John H. Moe, a specialist in orthopedic surgery, is professor and Director of his Department at the University of Minnesota. Each was a very well-qualified expert. The jury was instructed, without objection, that it was their responsibility to evaluate the obviously diverse opinions of the experts based on the education, training, experience and testimony of each of them.

■ The plaintiffs urge that defendants' experts were not specialists in neurosurgery and that it was error to admit their testimony. This is not the law, as our Court of Appeals has pointed out. It is well established that "the testimony of a qualified medical doctor cannot be excluded simply because he is not a specialist * * *." Harris v. Smith, 372 F.2d 806, 814 (8th Cir. 1967). The matter of " * * * training and specialization of the witness goes to the weight rather than admissibility * * *." Baerman v. Reisinger, 124 U.S.App.D.C. 180, 363 F.2d 309, 310 (1966).

■ In determining the admissibility of evidence and the competency of witnesses, we federal judges are governed by Rule 43(a) of the Federal Rules of Civil Procedure which "favors the reception of evidence." We have a fairly wide discretion in this. General Insurance Co. of Amer. v. Hercules Constr. Co., 385 F.2d 13 (8th Cir. 1967). A similar rule prevails in the Minnesota courts. State v. Schwartz, 266 Minn. 104, 122 N.W.2d 769, 773 (1963).

■■ It did not appear to the court that a medical doctor had to be a specialist in neurosurgery to express the opinions permitted to be expressed by plaintiffs' doctors, e. g., the immediate need for a decompression in the light of certain neurological deficits in a post-laminectomy patient. As stated above, there was no issue as to the proper execution of the neurosurgery. The medical testimony supported plaintiffs' theory of negligence and causation.

■ The jury members were free to attach such importance and weight to it as they had a mind to do in the light of the qualifications, education, experience and testimony of each of plaintiffs' doctors. They were so instructed by the court.

In my view, no prejudicial rulings with reference to the reception of medical evidence or otherwise were made.

Of course, the basic issue was one of fact, and much of the fact testimony dealt with the action of the medical assistants to Dr. Baker in making periodic examinations of Mrs. Frost during the post-operative period, determining her condition, recording their findings, and keeping Dr. Baker advised as to her condition and the need for surgical intervention. These assistants were agents of the defendants for whose conduct the defendants were responsible. While the plaintiffs alleged that Dr. Baker was negligent, their principal urging was that the assistants to Dr. Baker were at fault in not attending Mrs. Frost with greater diligence, in not observing and recording her condition in the hospital charts regularly and correctly, and in not advising their superior, Dr. Baker, more promptly as to her claimed perilous condition, so that the second operation could be performed at an earlier time. Defendants, of course, sought to show otherwise.

■ But, basically the jury had a fact decision to make. There was conflicting evidence and differing deductions to be made from it. The jury resolved the conflict in the plaintiffs'

favor. There is substantial evidence to support that decision. It is not the proper province of the court to sit as a 13th juror and substitute its judgment for that of the jury. This would impinge on the "exclusive function" of the jury. See Parke-Davis v. Stromsodt, 411 F.2d 1390, 1399 (8th Cir. 1969).

The defendants' motions for Judgment N.O.V. or a new trial are denied.